**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **COMCAST OF OREGON II, INC.**, a **Delaware corporation**, | Case No. 3:20-cv-1225-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **CITY OF BEAVERTON, an Oregon municipal corporation**, | |
| Defendant. | |
| **CITY OF BEAVERTON, an Oregon municipal corporation**, | |
| Counterclaim-Plaintiff, | |
| v. | |
| **COMCAST OF OREGON II, INC., a Delaware corporation; and COMCAST BUSINESS COMMUNICATIONS, LLC, a Pennsylvania limited liability company**, | |
| Counterclaim-Defendants. | |

Mark P. Trinchero, Blake J. Robinson, and Alan J. Galloway, DAVIS WRIGHT TREMAINE LLP, 1300 SW Fifth Avenue, Suite 2400, Portland, OR 97201; David P. Murray and Matthew W. Johnson, WILKIE FARR & GALLAGHER LLP, 1875 K Street, NW, Washington, D.C. 20006. Of Attorneys for Comcast of Oregon II, Inc. and Comcast Business Communications, LLC.

Laura Salerno Owens, David B. Markowitz, Anna M. Joyce, and Anit K. Jindal, MARKOWITZ HERBOLD PC, 1455 SW Broadway, Suite 1900, Portland, OR 97201. Of Attorneys for City of Beaverton.

**Michael H. Simon, District Judge.**

Comcast of Oregon II, Inc. (Comcast) brings this action against the City of Beaverton (City), alleging that the Cable Communications Policy Act of 1984 (Cable Act or Act) preempts the City's rights-of-way fee (ROW Fee) assessed against Comcast's provision of broadband services over the City's rights-of-way. Comcast brings a 42 U.S.C. § 1983 claim for violation of the Contract Clause of the U.S. Constitution, a claim for declaratory judgment, and two common law claims. The City asserts counterclaims against Comcast and its affiliate, Comcast Business Communications, LLC (Comcast Business) for unpaid ROW fees plus interest and for violation of the dispute resolution provision of the parties' contract. Comcast moves for partial summary judgment on its second claim and against the City's first and second counterclaims. The City cross-moves for summary judgment against all of Comcast's claims and in favor of the City's first and second counterclaims. For the reasons below, the Court GRANTS Comcast's motion for partial summary judgment and GRANTS IN PART AND DENIES IN PART the City's cross-motion for summary judgment.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view

the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

When parties file cross-motions for summary judgment, the Court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

### A. Statutory and Regulatory Background

Under the Cable Act, cable operators must obtain a cable franchise from a franchising authority to provide cable services over public rights-of-way. *See* 47 U.S.C. § 541(b)(1). In exchange for granting a franchise, a local franchising authority (LFA), such as a city or other local government body, may collect from the cable operator fees for the use of public rights-of-way. The Act limits those franchise fees to five percent of a cable operator's gross revenues from cable services. *Id.* § 542(b). These fees may be passed on to cable subscribers. *Id.* § 542(c), (e); *City of Eugene v. FCC*, 998 F.3d 701, 706 (6th Cir. 2021).

In March 2007, after a period of notice and comment, the FCC released an order to address what it identified as a practice by local franchising authorities of imposing unreasonable barriers to new cable operator's entry into the market. *In the Matter of Implementation of Section 621(A)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, 22 FCC Rcd. 5101 (2007) (*First Order*). In the *First Order*, the FCC clarified, among other things, that a local franchising authority's jurisdiction under the Cable Act extended only to the regulation of cable services over cable systems. *Id.* ¶ 121. The FCC stated that local franchising authorities may not require cable operators to obtain franchises to provide non-cable services over those same cable systems and may not regulate a cable operator's provision of non-cable services. *Id.* ¶¶ 121-122. Specifically, the FCC concluded that a "cable operator is not required to pay franchise fees on revenues from non-cable services," which includes the provision of broadband services, and that the Cable Act preempted any local law stating otherwise. *Id.* ¶¶ 98, 125. This prohibition of a local franchising authority's regulation of non-cable services has come to be known as the "mixed-use rule." *See City of Eugene*, 998 F.3d at 706. The *First Order* also included a further notice of proposed

rulemaking, seeking comment on whether the conclusions of the *First Order* should apply to incumbent cable operators in addition to incoming franchisees. *First Order*, ¶ 5.

Various local franchising authorities filed petitions for review of the *First Order* under the Hobbs Act, which were consolidated in the Sixth Circuit. *See All. for Cmty. Media v. FCC*, 529 F.3d 763, 772 (6th Cir. 2008). The Hobbs Act provides that federal courts of appeal have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communications Commission." 28 U.S.C. § 2342. To challenge the validity of an order, an aggrieved party must file a petition within 60 days after entry of the order in the appropriate court of appeals. *Id.* § 2344. If more than one petition is filed, the Judicial Panel on Multidistrict Litigation consolidates those petitions into one court of appeals *Id.* § 2112(a)(3).

Several petitioners challenged the mixed-use rule contained in the *First Order* on the basis that 47 U.S.C. § 542(g)(2)(D) exempted franchise fees for non-cable services from the five percent cap under § 542(b) because those non-cable services fees were only "incidental to" the awarding of a franchise.[1] *See All. for Cmty. Media*, 529 F.3d at 782. The Sixth Circuit rejected petitioners' arguments and upheld the *First Order* as valid. *Id.* at 787. Affording deference to the FCC under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the Sixth Circuit explained that the FCC's interpretation of the Cable Act's definition of "franchise fee" as including fees for non-cable services was reasonable. *Id.* at 782-83.

---

[1] Section 542(g)(2)(D) exempts from the definition of "franchise fee" any "requirements or charges incidental to the awarding or enforcing of the franchise, including payments for bonds, security funds, letters of credit, insurance, indemnification, penalties, or liquidated damages." 47 U.S.C. § 542(g)(2)(D).

After further notice and comment, the FCC in November 2007 issued a second order addressing local franchising authorities' jurisdiction under the Cable Act. *See In the Matter of Implementation of Section 621(A)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, 22 FCC Rcd. 19,633 (2007) (*Second Order*). The *Second Order* extended the mixed-use rule to incumbent cable operators. *Id.* ¶ 17 ("[W]e clarify that LFAs' jurisdiction under Title VI over incumbents applies only to the provision of cable services over cable systems and that an LFA may not use its franchising authority to attempt to regulate non-cable services offered by incumbent video providers." (footnote omitted)). Various local franchising authorities filed petitions for reconsideration of the *Second Order* with the FCC. *Montgomery County v. FCC*, 863 F.3d 485, 488 (6th Cir. 2017). Seven years later, the FCC largely rejected those petitions for reconsideration. *See Implementation of 621(a)(1) of the Cable Communications Policy Act*, 30 FCC Rcd. 810 (2015).

Local franchising authorities petitioned for review of the *Second Order* and reconsideration order in the Sixth Circuit, challenging, among other things, the extension of the mixed-use rule to incumbent operators. *Montgomery County*, 863 F.3d at 488, 492. The petitioners acknowledged that the mixed-use rule was "defensible as applied to Title II carriers" because 47 U.S.C. § 522(7)(C) provides that franchising authorities may only regulate Title II carriers (also known as "common carriers") to the extent they provide cable services. *Id.* at 492. The petitioners argued, however, that as applied to incumbent operators, most of whom were not common carriers, the mixed-use rule lacked any statutory basis. *Id.* at 493. The Sixth Circuit agreed. The Sixth Circuit explained that § 522(7)(C) applied only to common carriers, and because many incumbent operators were not common carriers, the *Second Order* failed to

provide an adequate statutory basis for extending the mixed-use rule to those incumbent operators. *Id.* The Sixth Circuit vacated the rule as applied to incumbent operators that are not common carriers and remanded the *Second Order* to the FCC so that it could provide a valid statutory basis for the extension of the rule. *Id.*

       The FCC offered that analysis in its third order, released in 2019. See In the Matter of Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992, 84 Fed. Reg. 44,725 (2019) (Third Order). The FCC offered two bases for its extension of the mixed-use rule to incumbent operators that are not common carriers. First, the FCC pointed to § 544(b)(1) of the Cable Act, which provides:

> [T]he franchising authority, to the extent related to the establishment or operation of a cable system . . . in its request for proposals for a franchise . . . may establish requirements for facilities and equipment, but may not . . . establish requirements for video programming or other information services.

47 U.S.C. § 544(b)(1); *see Third Order*, ¶¶ 73-79. The FCC explained that any fees for the provision of broadband services amounted to improper regulation of information services in violation of § 544(b)(1). *Third Order*, ¶ 74. Thus, the FCC concluded, franchising authorities could not require "a cable operator to pay fees or secure a franchise to provide broadband service via its franchised cable system." *Id.* ¶ 76.

       Second, the FCC pointed to the definition of "franchise fee" under § 542(g) of the Cable Act. *Id.* ¶¶ 90-92. Section 542(g) defines "franchise fee" as "any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such." 47 U.S.C. § 542(g)(1). The FCC explained that a fee levied against a non-common carrier cable operator for the provision of non-cable services (such as broadband) in addition to cable services all fit within the definition of

"franchise fee" and would therefore be capped at five percent of the operator's revenue derived from cable services under § 542(b). *Third Order*, ¶¶ 90-92. Further, the FCC noted that the phrase "solely because of their status as such" used in § 542(g)(1) meant a fee imposed on a cable operator solely because of their status as a cable operator or franchisee. *Id.* ¶ 93. Additionally, the FCC attached the following final rule to be published in the Code of Federal Regulations, codifying the mixed-use rule: "A franchising authority may not regulate the provision of any services other than cable services offered over the cable system of a cable operator, with the exception of channel capacity on institutional networks." *See Third Order*, Appendix A; 47 C.F.R § 76.43.

Local franchising authorities petitioned for the Sixth Circuit's review of the *Third Order*. *See City of Eugene*, 998 F.3d at 705. Among other things, the petitioners challenged both statutory bases for the FCC's extension of the mixed-use rule to incumbent operators that are not common carriers. *Id.* at 710. The Sixth Circuit agreed with the FCC as to its analysis of § 544(b)(1) but rejected the FCC's analysis of § 542(g). *Id.* at 712-16. With respect to § 544(b)(1), the Sixth Circuit concluded that franchising authorities "cannot require payment of an information-services fee as a condition of obtaining a franchise" and cannot "end-run" around that prohibition by imposing the same fee via police power. *Id.* at 711, 715. As an illustration of the rule, the Sixth Circuit explained that the City of Eugene's seven-percent broadband services fee as applied to cable operators was "merely the exercise of [the City's] franchise power by another name" and therefore circumvented what § 544(b)(1) directly prohibited and was preempted under § 556(c). *Id.* at 715.

The Sixth Circuit in *City of Eugene*, however, rejected the FCC's analysis of § 542(g). *Id.* at 712-14. The Sixth Circuit explained that a franchise fee imposed on a cable operator's

provision of non-cable services is not imposed "solely because of" its status as a cable operator but instead because of its provision of those non-cable services. *Id.* The Sixth Circuit therefore rejected that basis for extending the mixed-use rule to non-common carrier incumbent operators. In sum, the Sixth Circuit upheld the mixed-use rule as stated in the *Third Order* as valid, but only on the FCC's interpretation of § 544(b)(1).

## B. Factual and Procedural Background

The parties agree there are no material facts in dispute. Comcast provides cable and broadband services over a cable system in the City's public rights-of-way. ECF 56, ¶ 2. In June 2015, Comcast and the City entered into the operative franchise agreement (Franchise Agreement or Agreement). [*Id.* ¶ 3] The Agreement authorizes Comcast to operate a cable system over the City's rights-of-way to provide cable services so long as Comcast pays to the City a fee of five percent of Comcast's revenues derived from its cable service. Comcast has paid all cable franchise fees due under the Agreement. [*Id.* ¶ 5]

In 2016, the City enacted an ordinance imposing a fee (ROW Fee) for all utility services provided over the City's rights-of-way. *See* Beaverton City Code §§ 4.15.010-.210. The ordinance provides:

> [E]very person that owns utility facilities in the City and every
> person that uses utility facilities in the City to provide utility
> service, whether or not the person owns the utility facilities used to
> provide the utility services, shall pay the rights-of-way fee for
> every utility service provided using the rights of way in the amount
> determined by resolution of the City Council.

*Id.* § 4.15.130(A) ECF 57, Ex. 1. The Beaverton City Council set the ROW Fee for communications services, which includes broadband services, at five percent of gross revenue. City of Beaverton Resolution No. 4382. *Id.* Ex. 2.

Comcast met with City officials in October 2016 and stated that the ROW Fee as applied to its broadband services put Comcast at a competitive disadvantage to its primary competitor, an incumbent local exchange carrier, because Oregon law prohibits the City from imposing the ROW Fee on that local exchange carrier. The City assured Comcast that it would not enforce the ROW Fee against Comcast until the issue of competitive disadvantage had been addressed. ECF 56, ¶ 8. The City then asked Comcast to provide a proposed amendment to the ROW Fee that would address the disparity. [*Id.* ¶ 9] Comcast submitted a proposed amendment but did not hear back from the City about the amendment.

In April 2019, the City demanded Comcast's payment of the ROW Fee as applied to its broadband services, in addition to the five percent fee it had paid for cable services pursuant to the Franchise Agreement. [*Id.* ¶ 10] Comcast met with City officials that month and stated that it believed that the ROW Fee as applied to its broadband services violated federal law. [*Id.* ¶ 11] Comcast then agreed to pay the ROW Fee under protest, reserving all rights, beginning in July 2019. [*Id.* ¶ 12] Comcast paid the ROW Fee through October 2021 and passed on the fee to its customers. [*Id.* ¶¶ 6, 12, Ex. 4] In total, Comcast paid $2,262,671 in ROW fees for its broadband services during those years. [*Id.* ¶ 12]

In July 2020, the City demanded Comcast's payment of the ROW Fee for October 2016 through June 2019. [*Id.* ¶ 13] Comcast disputed the City's demand and filed a complaint in this Court, seeking a declaration that the ROW Fee violated federal law. In August 2020, the City filed a complaint against Comcast in Washington County Circuit Court seeking payment of the ROW Fee for the period of 2016 to 2019. Comcast removed that case to this Court, which was consolidated with Comcast's earlier pending action against the City. In January 2021, Comcast moved for partial summary judgment and the City moved for partial judgment on the pleadings.

The Court heard oral argument on those motions in March 2021. The Court discussed with the parties the pending petitions for the Sixth Circuit's review of the FCC's *Third Order* in *City of Eugene*. Because resolution of the parties' claims largely relied on the *Third Order*, the parties agreed to stay the case until the Sixth Circuit ruled on its validity.

The Sixth Circuit issued its decision in May 2021, upholding the *Third Order* as valid. *See City of Eugene*, 998 F.3d at 701. Comcast filed a third amended complaint (the operative complaint), asserting four claims: (1) a claim under 42 U.S.C § 1983, alleging a violation of the Contract Clause of the U.S. Constitution; (2) a claim under 28 U.S.C § 2201 for declaratory judgment; (3) a state law claim for money had and received; and (4) a state law claim for unjust enrichment. For its claim under § 1983, Comcast seeks nominal damages, injunctive relief, and attorney's fees. Comcast's claim for declaratory judgment seeks a declaration that the ROW Fee is void and unenforceable as applied to Comcast's provision of broadband services and seeks a declaration that Comcast should recover the ROW fees it has paid for its broadband services. For its state law claims, Comcast seeks compensatory damages in the amount of $2,622,671 plus interest. The City filed three counterclaims against Comcast and Comcast Business: (1) a claim for the unpaid ROW fees under Oregon Revised Statutes (ORS) § 30.315; (2) a claim for unpaid interest; (3) and a claim for breach of contract. The City seeks $2,950,000 from Comcast and Comcast Business.

Pending before the Court are the parties' cross-motions for summary judgment. Comcast moves for partial summary judgment on its second claim, seeking a declaration that the ROW Fee as applied to broadband services is void and unenforceable, and against the City's first and second counterclaims. The City moves for summary judgment on its first and second counterclaims and against all of Comcast's claims.

**DISCUSSION**

**A.  The FCC Orders**

Under the Hobbs Act, federal courts of appeal have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity" of all final FCC orders. 28 U.S.C. § 2342. To invoke the court of appeals' review, a party aggrieved by the final order must file a petition to review the order within 60 days after its entry. *Id.* § 2344. If petitions for review of the same order are filed in more than one court of appeals, the Judicial Panel on Multidistrict Litigation consolidates the petitions in one court of appeals. *Id.* § 2112(a)(3). The court of appeals designated for the consolidated petitions then becomes "the sole forum for addressing . . . . the validity of the FCC's rules." *MCI Telecomms. Corp. v. U.S. W. Commc'ns*, 204 F.3d 1262, 1267 (9th Cir. 2000) (quoting *GTE S., Inc. v. Morrison*, 199 F.3d 733, 743 (4th Cir. 1999)). The designated court of appeals' determination binds all other circuits. *See Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057 (9th Cir. 2008) ("[T]he Eleventh Circuit's decision regarding the validity of the *Second Report and Order* is binding outside of the Eleventh Circuit."); *see also Gorss Motels, Inc. v. FCC*, 20 F.4th 87, 92 (2d Cir. 2021) ("So once the D.C. Circuit invalidated the 2014 Order and the Solicited Fax Rule, that holding became binding in effect on every circuit in which the regulation's validity is challenged.").

The parties do not dispute that the FCC orders at issue are final orders subject to the Hobbs Act. Thus, the Sixth Circuit's determinations of the validity of the *First Order* in *Alliance for Community Media v. FCC*, 529 F.3d 763 (6th Cir. 2008), of the *Second Order* in *Montgomery County v. FCC*, 863 F.3d 485 (6th Cir. 2017), and of the *Third Order* in *City of Eugene v. FCC*, 998 F.3d 701 (6th Cir. 2021), are binding on this Court. The Sixth Circuit's determination that the mixed-use rule as stated in the *First*, *Second*, and *Third Orders* are partially valid, however, does not end our analysis. The question arises whether the Court must

accept the conclusions of an FCC order without conducting its own independent analysis. That is, if a district court rejects an issue conclusively decided by the FCC in an order, has the court improperly rejected the order's "validity" in contravention of the Hobbs Act?

The City argues that even accepting an FCC order (and in particular, the *Third Order*) as valid, the court may still reject the order if the Court concludes it is not entitled to deference. The City contends that it is not asking the Court to invalidate the FCC's orders but instead only afford the appropriate level of deference when applying the orders to the facts of this case. The City cites *CallerID4u, Inc. v. MCI Communications Services Inc.*, 880 F.3d 1048 (9th Cir. 2018), *MetroPCS California, LLC v. Picker*, 970 F.3d 1106 (9th Cir. 2020), and *Pacific Bell Telephone Co. v. California Public Utilities Commission*, 621 F.3d 836 (9th Cir. 2010), for that proposition. Comcast, on the other hand, argues that the Sixth Circuit's holding that the FCC validly concluded that 47 U.S.C. § 544(b)(1) preempts a local franchising authority's regulation of non-cable services is binding on this Court. Rejection of that valid portion of the FCC's order, Comcast argues, would effectively invalidate the order in violation of the Hobbs Act and reject the reasoning of the Sixth Circuit, which is binding on this Court. Comcast cites *US West Communications, Inc. v. Hamilton*, 224 F.3d 1049 (9th Cir. 2000), for that proposition.

In *Hamilton*, the district court declined to defer to the FCC's interpretation of the Cable Act as stated in one paragraph of a 1,400-paragraph FCC order. *US W. Commc'ns, Inc. v. AT & T Commc'ns of Pac. Nw., Inc.*, 31 F. Supp. 2d 839, 851 (D. Or. 1998). The FCC, which participated in the litigation as amicus, had argued that under the Hobbs Act, the district court was bound to apply the agency's interpretation. *Id.* The district court rejected that position and instead considered whether the order was entitled to deference under *Chevron*. *Id.*

The district court concluded that the FCC's interpretation contradicted the plain meaning of the Cable Act and therefore declined to adhere to that portion of the FCC's order. *Id.* The Ninth Circuit reversed. *Hamilton*, 224 F.3d at 1054. The Ninth Circuit first noted that it had "serious doubts about the FCC's analysis" and that it "share[d] the district court's discomfort with the FCC's interpretation" of the Cable Act. *Id.* at 1053-54. Nevertheless, the Ninth Circuit explained that under the Hobbs Act, it was "not at liberty to review" the FCC's interpretation. *Id.* at 1055. Instead, the court was obliged "to apply ¶ 1231 as it is written and to uphold the provisions of the parties' agreements" that complied with ¶ 1231 of the FCC's order but conflicted with both the district court and Ninth Circuit's interpretation of the Cable Act. *Id.* Thus, the holding of *Hamilton*, which binds this Court, is that a district court must apply an agency order as written because declining to do so would violate the Hobbs Act.

The City argues that *Wyeth v. Levine*, 555 U.S. 555 (2009), overruled *Hamilton*. A court of last resort "effectively overrule[s]" an opinion from a lower court if the court of last resort "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003). Thus, *Wyeth* overrules *Hamilton* if the Supreme Court's reasoning undercuts the Ninth Circuit's theory or reasoning underlying its opinion in *Hamilton* such that the two opinions are clearly irreconcilable. The Court does not find that *Wyeth* and *Hamilton* are clearly irreconcilable. In *Wyeth*, the Supreme Court held that the Food and Drug Administration's (FDA) approval of the warnings on a drug manufacturer's label did not provide a complete defense to the plaintiff's failure-to-warn claim. *Wyeth*, 555 U.S. at 558-59. In reaching that conclusion, the Supreme Court explained that the weight it afforded to the FDA's statement about preemption depended

on the FDA's "thoroughness, consistency, and persuasiveness," which is the standard the City

asks the Court to apply here. *Id.* at 577.

Wyeth, however, is not clearly irreconcilable with *Hamilton* because FDA regulations and

orders are not subject to the Hobbs Act. *See* 28 U.S.C § 2342. The reasoning underlying the

Ninth Circuit's decision in *Hamilton* is that the Hobbs Act precludes lower courts from rejecting

the conclusions of the FCC included in its final orders, even after conducting an analysis under

the appropriate deference doctrine such as *Chevron*. *See Hamilton*, 224 F.3d at 1055. The

Supreme Court was not faced with this issue in *Wyeth* because the FDA's statement about

preemption was not subject to the Hobbs Act or any similar statute. The Court therefore

concludes that *Wyeth* did not overrule *Hamilton*.

The City also argues that three Ninth Circuit decisions, *CallerID4u*, *MetroPCS*, and

*Pacific Bell*, which were all issued after *Hamilton*, allow a district court to reject a valid agency

order if the court concludes that the order is not entitled to deference. In each of those decisions,

however, the Ninth Circuit expressed its agreement with the agency in support of the court's

application of the agency order. *See MetroPCS*, 970 F.3d at 1121 ("We agree with the reasoning

of our sister circuit and the FCC."); *CallerID4u*, 880 F.3d at 1065 ("We agree with the reasoning

of . . . the FCC in *All American II* and conclude that the preemptive effect of the filed rate

doctrine precludes CallerID4u from recovering damages under a theory of unjust enrichment or

quantum meruit."); *Pac. Bell Tel. Co.*, 621 F.3d at 846 ("This interpretation of the [Local

Competition Order] is reasonable and entitled to deference."). None of those cases *reject* an issue

decided in a valid agency order after concluding the order was *not* entitled to deference. Thus, at

most, these cases illustrate that a court may express its independent agreement with the agency

even though it is bound to apply the agency's order under the Hobbs Act as interpreted by the Ninth Circuit in *Hamilton*.[2]

*CallerID4u*, however, creates a wrinkle in this analysis. In *CallerID*, the Ninth Circuit acknowledged that it was bound under the Hobbs Act to accept FCC orders as valid and proceeded to apply the FCC orders at issue without conducting any independent analysis. *See CallerID4u*, 880 F.3d at 1062. With respect to the parties' dispute about preemption, however, the Ninth Circuit stated that it did "not need to defer to the FCC's views" but would "give it weight where its reasoning is persuasive." *Id.* at 1064 (citing *Wyeth*, 555 U.S. at 557). The Ninth Circuit ultimately agreed with the FCC on the preemption issue. *Id.* at 1065. Nevertheless, the court's statement that it was not bound by the FCC's views on preemption appears to conflict with the court's position in *Hamilton*, which held that even if a court disagrees with the FCC on an issue of federal law, it must still apply the order as written. *See Hamilton*, 224 F.3d at 1055.

The Ninth Circuit in *CallerID4u*, however, did not discuss or include any citation to *Hamilton* and did not explain why the Hobbs Act applied to the FCC's order as to all issues except for the FCC's statement about the preemptive effect of state law claims. Thus, despite the tension between *CallerID4u* and *Hamilton*, the Court finds that *Hamilton* controls because it

---

[2] The Ninth Circuit in *MetroPCS* did conclude that one portion of the FCC order at issue did "not provide a basis" for concluding that certain state regulations were preempted because the FCC had only stated in its order that the state regulation "may be subject to preemption." *MetroPCS*, 970 F.3d at 1125. A cursory statement within an FCC order that certain actions "may" be preempted, however, is not an issue conclusively decided subject to the Hobbs Act. *See Pac. Bell v. Pac W. Telecomm, Inc.*, 325 F.3d 1114, 1125 (9th Cir. 2003) (stating that under the Hobbs Act, a "district court must dismiss a complaint if it directly attacks an FCC order or if it raises only issues that were *conclusively decided* by the FCC order" (emphasis added)); *see also Hamilton*, 224 F.3d at 1055 (stating that a paragraph in an FCC order is not a "final order" subject to the Hobbs Act if it is tentative" or "interlocutory").

directly addresses the issue presented here, which is whether under the Hobbs Act a court may independently review an agency's construction of the statute it enforces. Moreover, a three-judge panel cannot overrule the holding of a prior panel, much less do so implicitly. *See De Mercado v. Mukasey*, 566 F.3d 810, 816 (9th Cir. 2009).

The question of exactly how to apply an FCC order subject to the Hobbs Act has secured no clear answer yet from either the Supreme Court or the Ninth Circuit. *See PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2053 (2019) (finding it "difficult to answer" whether a district court must follow FCC orders under the Hobbs Act and remanding for resolution of two preliminary issues). The appellate courts may give further guidance on these difficult issues, but for now, *Hamilton* remains binding precedent on this Court. *See Canady v. Bridgecrest Acceptance Corp.*, 2022 WL 194526, at *5 (D. Ariz. Jan. 21, 2022) (declining to consider an as-applied, constitutional challenge to FCC-created exceptions to the Telephone Consumer Protection Act because the challenge required the court to determine the validity of the FCC's orders in violation of the Hobbs Act); *True Health Chiropractic Inc. v. McKesson Corp.*, 2020 WL 7664484, at *6 (N.D. Cal. Dec. 24, 2020) (discussing *PDR Network* and concluding that under Ninth Circuit precedent, district courts must treat FCC orders as "authoritative" and may not "question their validity" (citing *Hamilton*)); *j2 Glob. Commc'ns, Inc. v. Protus IP Sols.*, 2008 WL 11335051, at *3 (C.D. Cal. Jan. 14, 2008) (declining to consider an issue already decided by the FCC and applying the FCC order "as it is written" (quoting *Hamilton*, 224 F.3d at 1055)). Further, the Ninth Circuit itself has applied FCC orders subject to the Hobbs Act without discussing any level of deference or conducting an independent analysis of the soundness of the FCC order. *See, e.g.*, *US W. Commc'ns, Inc. v. Jennings*, 304 F.3d 950, 958-63 (9th Cir. 2002) (stating that under the Hobbs Act, the court must "apply all valid

implementing FCC regulations now in effect" and applying the FCC orders as written); *see also CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 447-50 (7th Cir. 2010) (holding that a district court lacks jurisdiction to conduct any analysis under *Chevron* of an agency order subject to the Hobbs Act). Until the appellate courts provide further guidance, this Court considers itself bound by *Hamilton*, which directs district courts to apply FCC orders as written.

The City raises an alternative argument that even if the Hobbs Act precludes independent district court review of issues conclusively decided in FCC orders, the Hobbs Act does not apply to the FCC's "interpretive rules." The Ninth Circuit, however, rejected this argument in *Hamilton*, stating that even if an FCC order is an interpretive rule, there is "no support for the proposition that it therefore falls outside the ambit of the Hobbs Act." *Hamilton*, 224 F.3d at 1055. The City nevertheless contends that the Supreme Court in *PDR Network* implicitly overruled that conclusion in *Hamilton*. The Court believes that the City is misreading *PDR Network*.

In *PDR Network*, the Supreme Court granted certiorari to answer the question posed here, which is "whether the Hobbs Act's vesting of 'exclusive jurisdiction' in the courts of appeals to 'enjoin, set aside, suspend,' or 'determine the validity' of FCC 'final orders' means that a district court must adopt, and consequently follow" an FCC order interpreting a statute it enforces. 139 S. Ct. at 2053. The Supreme Court declined to answer that question. *Id.* at 2056. Instead, it remanded the case so that the court of appeals could decide two preliminary issues. *Id.* at 2055. One of the preliminary issues was whether the FCC order was a "legislative rule" or an "interpretive rule." *Id.* The Supreme Court made clear, however, that it posed this question to the court of appeals without deciding whether, and if so how, the distinction between an interpretive rule and a legislative rule may affect the applicability of the Hobbs Act. *See id.* ("If the relevant

portion of the 2006 Order is the equivalent of an 'interpretive rule,' it may not be binding on a district court, and a district court therefore may not be required to adhere to it. . . . We say 'may' because we do not definitively resolve these issues here."). The Court will not speculate as to how the Supreme Court ultimately will resolve *PDR Network* after the remanded appeal. Thus, *Hamilton* remains binding on this Court, and under *Hamilton* the Hobbs Act applies to final agency orders regardless of whether they are interpretive or legislative. *Hamilton*, 224 F.3d at 1055.

**B. The City's ROW Fee and the *Third Order***

    **1. Whether the *Third Order* Applies to the ROW Fee**

The City contends that even if the Court must adhere to the *Third Order* as written, the order only preempts the City of Eugene's fee, which was the fee at issue in *City of Eugene*. Specifically, the City argues that the Sixth Circuit created only one exception to its "wholesale" rejection of the mixed-use rule in its review of the FCC orders. Thus, the City maintains, the only issue conclusively decided in the *Third Order* was that the Cable Act preempted the City of Eugene's fee and the *Third Order* applies here only to the extent that the ROW Fee is analogous to the City of Eugene's fee. ECF 58, at 27-28. The City misreads the FCC's orders and the Sixth Circuit's opinions upholding those orders.

The Sixth Circuit did not wholesale reject the mixed-use rule. Nor did it create only one exception to that rule. In *Alliance for Community Media*, the Sixth Circuit upheld the FCC's *First Order* as valid, which provided the first iteration of the mixed-use rule and applied the rule to incoming franchisees, most of whom were common carriers. 529 F.3d at 782-83; *see also Montgomery County*, 485 F.3d at 493 ("Understandably, then, the FCC invoked § 522(7)(C) as the statutory basis—indeed as the only statutory basis—for its decision to apply the mixed-use rule to new entrants."). Later, in *City of Eugene*, the Sixth Circuit upheld as valid the FCC's

mixed-use rule as stated in the *Third Order*, which extended the rule to incumbent cable

operators. *City of Eugene*, 998 F.3d at 716. As the City points out, the Sixth Circuit in *City of*

*Eugene* rejected one of the FCC's asserted statutory bases for applying the mixed-use rule to

incumbent operators but accepted the FCC's alternative statutory basis. Thus, as it stands, the

Sixth Circuit has upheld the FCC's mixed-use rule as applied to both incoming and incumbent

cable operators.

After upholding the mixed-use rule in *City of Eugene*, the Sixth Circuit then applied that

rule to the facts before it. *Id.* at 715. The Sixth Circuit concluded that the Cable Act preempted

the City of Eugene's fee because that fee attempted to end-run around § 544(b)(1) of the Cable

Act. *Id.* Here, under *Hamilton*, the Court is bound to apply the mixed-use rule as stated in the

valid portions of the *Third Order*, not only to the extent the City's ordinance is analogous to the

City of Eugene's fee.

The following valid portions of the *Third Order* show that a local franchising authority

may not collect fees from a cable operator's provision of broadband services:

> - Because the Commission has determined that broadband Internet access service is an "information service" under section 3(24), we likewise find that section 624(b)(1) precludes LFAs from regulating broadband Internet access provided via the cable systems of incumbent cable operators that are not common carriers. . . . *LFAs may not lawfully impose fees for the provision of information services (such as broadband Internet access) via a franchised cable system . . . .*

*Third Order*, ¶ 74 (footnote omitted) (emphasis added).

> - LFAs are precluded under section 624(b)(1) from regulating non-cable services provided over the cable systems of incumbent cable operators that are not common carriers. LFAs, therefore, may not lawfully regulate the non-cable services of such cable operators, including information services (such as broadband Internet access) . . . . *For example, this precludes LFAs from . . . requiring such a cable operator to pay fees or secure a franchise to provide*

> *broadband service via its franchised cable system* . . . .

*Id.* ¶ 76 (footnote omitted) (emphasis added).

- [A]lthough Sections 602(7)(C) and 624(b)(1) by their terms circumscribe *franchising authority* regulation of non-cable services *pursuant to Title VI*, section 636(c) makes clear that state and local authorities may not end-run the provisions of Title VI simply by asserting some other source of authority—such as their police powers to regulate access to public rights-of-way—to accomplish what Title VI prohibits.

*Id.* ¶ 106 (emphasis in original).

Here, the ROW Fee imposes a fee on Comcast's provision of broadband service, which the *Third Order* as upheld by the Sixth Circuit directly prohibits. The City's fee, therefore, is preempted under 47 U.S.C. § 556(c); *see Third Order*, ¶ 106. The City nevertheless contends that the ROW Fee does not impose a fee for the provision of broadband service because it is a fee applicable to all utility services using public rights-of-way. ECF 68, at 28. Under the terms of the ROW Fee, however, Comcast must pay a percentage of its revenue derived from the provision of broadband services via its franchised cable system. That fee, as applied to Comcast, falls within the FCC's articulation of the mixed-use rule as upheld by the Sixth Circuit. *See Third Order*, ¶¶ 74, 76. The City may not "end-run" § 544(b)(1) by also applying the fee to other utilities that also use public rights-of-way. *See id.* ¶ 106; *City of Eugene*, 998 F.3d at 711 ("[W]e agree with the FCC's conclusion that 'states and localities [may] not "end-run" the Cable Act's limitations by using other governmental entities or other sources of authority to accomplish indirectly what franchising authorities are prohibited from doing directly.'" (citing *Third Order*, ¶ 81)); *see also id.* at 715 (concluding that the City of Eugene's ordinance imposing a seven percent fee on cable operators' provision of broadband services improperly circumvented 47 U.S.C. § 544(b)(1) as interpreted by the FCC in the *Third Order*).

PAGE 21 – OPINION AND ORDER

The City also argues that any reading of § 544(b)(1) as preempting a local franchising authority's "generally applicable" fee levied against a cable operator's provision of non-cable services contradicts the Cable Act's definition of "franchise fee" under § 542(g). The City asserts that § 542(g) exempts from the definition of "franchise fee" any fee of "general applicability" and thus, preemption of what the City argues is a generally applicable fee would conflict with the Cable Act. *See* 47 U.S.C § 542(g)(2)(A). ECF 68, at 21-22. Section 544(b)(1)'s preemption of the ROW Fee, however, does not rely on the Cable Act's definition of "franchise fee." That reasoning was rejected by the Sixth Circuit. *See City of Eugene*, 998 F.3d at 712-14. Instead, the *Third Order*, as upheld, concludes that local franchising authorities unlawfully circumvent § 544(b)(1)'s prohibition on requirements for information services in franchise proposals by imposing franchise fees on those services via police power. *See id.* at 714-16. Here, the Court similarly concludes that the City has unlawfully circumvented § 544(b)(1) by imposing a rights-of-way fee for broadband services via its police power. That conclusion does not rely on any statutory definition of "franchise fee" and therefore does not conflict with § 542(g)(2)(A).[3]

### 2.  Whether the *Third Order* Is Retroactive

The City also argues that even if this Court were bound to apply the *Third Order* to the ROW Fee, the terms of the order prohibit any retroactive application of the mixed-use rule. The City points to paragraph 62 of the *Third Order*, which states that the "franchise fee rulings we adopt in this Order are prospective" and that "cable operators may count only ongoing and future in-kind contributions toward the five percent franchise fee cap after the Order is effective." *Third Order*, ¶ 62. Paragraph 62, however, concludes the FCC's analysis of a separate issue not present

---

[3] Because the Court must follow the FCC's interpretation of § 544(b)(1) as upheld by the Sixth Circuit in the *Third Order*, the Court need not address the parties' textual arguments. *See Hamilton*, 224 F.3d at 1055.

in this case, which is whether the value of any "in-kind," that is, non-monetary, regulation of cable services is subject to the five percent cap on a cable operator's payment of franchise fees. *See id.* ¶¶ 8-63.

Moreover, paragraph 62 itself makes clear that its use of the phrase "franchise fee ruling" refers only to the in-kind franchise fee rule because it explains that "cable operators may count only ongoing and future *in-kind* contributions toward the five percent franchise fee cap." *Id.* ¶ 62 (emphasis added). The City acknowledges that paragraph 62 follows the FCC's discussion of the in-kind franchise fee issue but points to the fact that the FCC refers to more than one "ruling" in that paragraph and so the mixed-use rule as applied to incumbent operators is also one of those rulings. In the *Third Order*, however, the FCC describes only the in-kind ruling as a "franchise fee" ruling and characterizes the mixed-use rule as simply the "mixed-use rule." *See* ¶ 8 ("[W]e conclude that cable-related, in-kind contributions required by LFAs from cable operators as a condition or requirement of a franchise agreement are franchise fees subject to the statutory five percent cap on franchise fees set forth in section 622 of the Act."); *id.* ("[W]e find that our mixed-use rule applies to incumbent cable operators."). The fact that the mixed-use rule affects the calculation of franchise fees does not necessarily establish that the FCC referred to that rule in paragraph 62.

The City also points to paragraph 125 of the *Third Order*, which states that the final rules included in Appendix A of the order "shall be effective 30 days after publication in the *Federal Register.*" *Third Order*, ¶ 125. Appendix A contains the mixed-use rule to be codified in the Code of Federal Regulations. The City contends that paragraph 125 therefore reflects the FCC's intention to apply the mixed-use rule to incumbent operators only prospectively. Paragraph 125, however, explains only that the amendments to the Code of Federal Regulations will take

effect 30 days after publication in the Federal Register, not that the FCC's interpretation of the

Cable Act as stated in the *Third Order* applies only prospectively. That is, although the

amendments to the Code of Federal Regulations did not occur until 30 days after the order's

publication in the Federal Register, the FCC's interpretation of the Cable Act became effective

as soon as the *Third Order* was published.

The Court therefore considers whether it should apply the *Third Order* retroactively.

Courts must apply interpretations of federal law to the conduct before the court, regardless of

whether that conduct occurred before or after announcement of that interpretation. *See Harper v.

Va. Dep't of Tax'n*, 509 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the

parties before it, that rule is the controlling interpretation of federal law and must be given full

retroactive effect in all cases still open on direct review and as to all events, regardless of

whether such events predate or postdate our announcement of the rule."). When applying federal

law, "the FCC's implementing regulations—including those recently reinstated and those newly

promulgated—must be considered part and parcel of the requirements of the Act." *Jennings*, 304

F.3d at 957. Further, there are no retroactivity concerns when the FCC's implementing

regulations interpret substantive provisions of a statute. *See Jennings*, 304 F.3d at 958 ("[T]he

newly promulgated regulations . . . are no less 'interpretive' than the regulation at issue in

*Pacific Bell* . . . . Therefore, we also hold pursuant to *Pacific Bell* that the newly promulgated

regulations do not have an impermissible retroactive effect."); *AT & T Commc'ns Sys. v. Pac.

Bell*, 203 F.3d 1183, 1187 (9th Cir. 2000) ("Because the regulation promulgated by

the FCC merely interprets the substantive provisions of the Act, it does not present retroactivity

concerns."); *Jordan v. Nationstar Mortg. LLC*, 2014 WL 5359000, at *12 n.2 (N.D. Cal. Oct. 20,

2014) ("While agency rules are generally not to be applied retroactively, *Bowen v. Georgetown*

*Univ. Hosp.*, 488 U.S. 204, 208 (1988), regulations promulgated by the FCC that merely interpret provisions of an act do not present retroactivity concerns." (citing *Pacific Bell*, 203 F.3d at 1187)); *City of Cincinnati v. Time Warner Cable, Inc.*, 2008 WL 11352596, at *7 (S.D. Ohio July 1, 2008) (concluding that the Cable Act, as interpreted by the FCC in its *First Order*, precluded local franchising authorities from collecting fees for common carriers' provision of non-cable services before the FCC issued its order); *see also Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 744 n.3 (1996) ("Where . . . a court is addressing transactions that occurred at a time when there was no clear agency guidance, it would be absurd to ignore the agency's current authoritative pronouncement of what the statute means.").

Here, the FCC interpreted § 544(b)(1) of the Cable Act as preempting local franchising authority regulation of a cable operator's provision of non-cable services. The Sixth Circuit upheld that interpretation in *City of Eugene*, and this Court is bound by that decision. Before applying the FCC's interpretation to conduct that occurred before it issued the *Third Order*, however, the Court finds it appropriate to follow the Ninth Circuit's guidance in *Jennings*, which assessed the propriety of retroactive application under the principles laid out in *GTE South, Inc. v. Morrison*, 199 F.3d 733 (4th Cir. 1999), and *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). *See Jennings*, 304 F.3d at 957.

The City contends that the Court should apply the five-factor test provided in *Oil, Chemical & Atomic Workers International Union, Local 1-547 v. NLRB*, 842 F.2d 1141 (9th Cir. 1988). Though similar to the factors laid out in *Jennings*, the five-factor test in *Oil, Cemical & Atomic Workers* appears to apply to a court's review of an agency's adjudicative decision creating a retroactive rule. The five-factor test provided in *Oil, Cemical & Atomic Workers* directly quotes *Montgomery Ward & Co. v. F.T.C.*, 691 F.2d 1322, 1333 (9th Cir. 1982), which

states that the test should be applied when "balancing a regulated party's interest in being able to rely on the terms of a rule as it is written[] against an agency's interest in retroactive application of an *adjudicatory decision*" (emphasis added). *See also Reyes v. Garland*, 11 F.4th 985, 992 (9th Cir. 2021) (applying *Montgomery Ward* to an agency's adjudicative decision); *Szonyi v. Barr*, 942 F.3d 874, 893-94 (9th Cir. 2019) (same); *Beneli v. NLRB*, 873 F.3d 1094, 1099 (9th Cir. 2017) (same).

The retroactivity principles provided in *Jennings* are whether the rule: (1) impairs vested rights; (2) alters past transactions; and (3) disrupts settled expectations. *Jennings*, 304 F.3d at 957 (citing *GTE S.*, 199 F.3d at 741 and *Landgraf*, 511 U.S. at 269 n.23). As for the first factor, the mixed-use rule as stated in the *Third Order* does not impair vested rights. The lack of a valid agency order or federal court decision interpreting the scope of a local franchising authority to regulate under § 544(b)(1) did not give the City a vested right to proceed on its own interpretation of the Cable Act. As for the second factor, however, the mixed-use rule does alter past transactions because the City's attempt to collect fees for a cable operator's provision of broadband services is now prohibited by the rule.

On the other hand, as for the third factor, the rule does not disrupt settled expectations. Before the *Third Order*, the FCC had already issued two iterations of the mixed-use rule, both in 2007. The *First Order* prohibited local franchising authorities from collecting fees from incoming franchisees' (most of whom were common carriers) provision of non-cable services. *See First Order*, ¶ 98. The Sixth Circuit upheld that order in *Alliance for Community Media*, 529 F.3d at 776-86. The *Second Order* extended that rule to incumbent operators. *See Second Order*, ¶ 17. In 2016, the Oregon Supreme Court declined to apply the mixed-use rule to incumbent operators. *City of Eugene v. Comcast of Oregon, Inc.*, 359 Or. 528, 558 (2016). In

2017, the Sixth Circuit remanded the *Second Order* to the FCC to provide an adequate statutory basis for extending the mixed-use rule to incumbent operators. *Montgomery County*, 863 F.3d at 493. Between 2018 and 2019, it was by no means settled that the mixed-use rule did not apply to incumbent operators as the only federal court to review the FCC's order remanded the order so that the FCC could provide further support for its interpretation of the Cable Act.[4]

On balance, these factors weigh in favor of applying the mixed-use rule to Comcast's provision of broadband services from 2018 to 2019, especially considering that the rule as applied here is an interpretation of § 544(b)(1) and the Court is bound to apply interpretations of federal law to the conduct before the Court, regardless of whether that conduct occurred before or after announcement of that interpretation. *See Harper*, 509 U.S. at 97.

## C. The City's ROW Fee and Broadband Services as "Telecommunications Services"

The parties agree that until June 2018, the FCC classified broadband services as telecommunications services, not information services. The City therefore argues that even if the *Third Order* preempts the City from collecting fees for an incumbent, non-common carrier cable operator's provision of non-cable services, Comcast did not fit that definition before June 11, 2018. The FCC's *First* and *Second Orders* as upheld by the Sixth Circuit in *Alliance for Community Media* and *Montgomery County*, however, conclude that a local franchising authority may not regulate a common carrier's provision of non-cable services. The *First Order* provides:

> We further clarify that an LFA may not use its video franchising authority to attempt to regulate a [local exchange carrier's] entire network beyond the provision of cable services. . . . [W]e find that the provision of video services pursuant to a cable franchise does not provide a basis for customer service regulation by local law or

---

[4] The Court considers the relevant period to begin in 2018 because, as explained below, the *First* and *Second Orders* bar the City's franchise fees as applied to Comcast's non-cable services until June 2018, the period during which the FCC classified broadband services as telecommunications services.

> franchise agreement of a cable operator's entire network, or any
> services beyond cable services.

*First Order*, ¶ 122. The order also provides that under the Cable Act, "local franchising laws,

regulations, and agreements are preempted to the extent they conflict with the rules we adopt in

this *Order*." *Id.* ¶ 129.

The *Second Order* confirms that "a cable operator is not required to pay cable franchise

fees on revenues from non-cable services" and extends that limitation to incumbent operators.

*Second Order*, ¶ 11. The Sixth Circuit then upheld that portion of the *Second Order* to the extent

it applied to incumbent cable operators that were common carriers. *Montgomery County*, 863

F.3d at 493 (vacating and remanding the mixed-use rule as stated in the *Second Order* to the

extent it applied to "incumbent cable providers that are not common carriers").

Comcast was a common carrier to the extent it provided telecommunications services

after the City enacted the ROW Fee and before the FCC reclassified broadband services as

information services in June 2018. *See* 47 U.S.C. § 153(51) ("The term 'telecommunications

carrier' means any provider of telecommunications services . . . . A telecommunications carrier

shall be treated as a common carrier under this chapter only to the extent that it is engaged in

providing telecommunications services . . . ."); *Fed. Trade Comm'n v. AT&T Mobility LLC*, 883

F.3d 848, 856 (9th Cir. 2018) ("A 'telecommunications carrier' is 'treated as

a common carrier . . . only to the extent that it is engaged in providing telecommunications

services.'" (quoting 47 U.S.C. § 153(51))). Thus, under the valid portions of the *First* and

*Second Orders*, the Cable Act preempted the City's regulation of Comcast's broadband services

from 2016 to 2018. The City, however, argues that these orders were amended twice and then

rejected by the Sixth Circuit, which leaves the Court with no rule to apply. ECF 58, at 38. This is

incorrect.

The *Second* and *Third Orders* did not amend the first order. The *Second Order* simply extended the mixed-use rule provided in the *First Order* to incumbent cable operators. As explained above, the Sixth Circuit vacated in part the *Second Order* and remanded so that the FCC could provide an adequate statutory basis for application of the mixed-use rule to incumbent operators that were not common carriers. *Montgomery County*, 485 F.3d. at 493. The FCC provided that supplemental authority in its *Third Order*. The Sixth Circuit upheld that order as valid in part. *See City of Eugene*, 998 F.3d at 714-15. Thus, taken together, these FCC orders and related Sixth Circuit opinions establish that the mixed-use rule applies to both incoming and incumbent operators, common carrier or not.

The City next argues that the *Second Order* only prohibits local franchising authorities from regulating a common carrier's provision of non-cable services pursuant to their franchising authority. The City points to paragraph 17 from the *Second Order*, which reads: "LFA's jurisdiction under Title VI over incumbents applies only to the provision of cable services over cable systems and that an LFA may not use its franchising authority to attempt to regulate non-cable services offered by incumbent video providers." *Second Order*, ¶ 17 (footnotes omitted). The City contends that the ROW Fee regulates Comcast's provision of non-cable services via its police power, not its franchising authority, and therefore does not violate the mixed-use rule as stated in the *Second Order*. ECF 68, at 30. The Sixth Circuit rejected this argument in *City of Eugene*. *See City of Eugene*, 998 F.3d at 715 ("The question, then, is whether the City circumvented that limitation when it imposed the same fee on a cable operator by means of the City's police power. We conclude that it did."). The Court finds the Sixth Circuit's reasoning persuasive and equally applicable here.

Finally, the City contends that the *Second Order* allows local franchising authorities to collect "non-cable franchise fees" for a common carrier's provision of non-cable services. ECF 58, at 37-38. Paragraph 11 of the *Second Order* provides: "The relevant findings from the *First Report and Order* that apply to incumbent providers include the following: (1) our clarification that a cable operator is not required to pay cable franchise fees on revenues from non-cable services . . . ." Footnote 31, however, adds: "This finding, of course, does not apply to *non-cable* franchise fee requirements, such as any lawful fees related to the provision of telecommunications services" (emphasis added). *Id.* ¶ 11 n.31. It appears that the *Second Order* states that a franchising authority can impose *non-cable* franchise fees on incumbent operators but not *cable* franchise fees. Though it is not entirely clear what distinction the FCC intended to make in its *Second Order*, the FCC in its *Third Order* "disavow[ed]" any reading of that note made "in passing" in its *Second Order* that would allow a local franchising authority to impose two fees on a cable operator's use of its rights-of-way. *See Third Order*, ¶ 96 n. 371. The FCC explained:

> [W]e would deem an LFA's assessment of a cable operator twice for accessing public rights-of-way (once as a cable operator and again as a telecommunications provider) to be unlawful as not "fair and reasonable" nor "competitively neutral and nondiscriminatory." *See infra* note 372. *See also* 47 U.S.C. § 253(c). To the extent our earlier statement may suggest any broader application, we disavow it based on the record before us and the arguments made throughout this item.

*Id.* The FCC rejected the argument that the City poses here that § 253(c) permits the City to require fees for both cable and telecommunications services:

> Although section 253 permits states and localities to require "fair and reasonable" compensation from telecommunications providers on a "competitively neutral and nondiscriminatory basis" for use of public rights-of-way, . . . we find that imposing fees on cable operators beyond what Title VI allows is neither "fair and reasonable" nor "competitively neutral and nondiscriminatory." . . .

> [W]e merely recognize that under the Act, cable operators must
> compensate local governments for accessing public rights-of-way
> under a statutory framework different from that applicable to
> telecommunications providers, and that Congress did not intend for
> them to be assessed twice for the provision of cable service or the
> facilities used in the provision of such service.

*Id.* ¶ 96 n.372. Although the Sixth Circuit in *City of Eugene* rejected the FCC's construction of "franchise fees" under § 522, it did not disturb the FCC's conclusion related to § 253(c). Further, the Court agrees with the FCC's reasoning and applies that reasoning here. Section 253(c) does not authorize the City to impose a fee on Comcast's provision of both cable services and broadband services during the period when the FCC classified broadband services as a telecommunications service.

In any event, § 522(7), on which the *First* and *Second Orders* ground the mixed-use rule as to common carriers, clearly states that franchising authorities may only regulate common carriers to the extent they provide cable services. *See* 47 U.S.C. § 522(7)(C) (including in the definition of "cable system" "a facility of a common carrier . . . to the extent such facility is used in the transmission of video programming directly to subscribers . . . ."); *Montgomery County*, 863 F.3d at 492 ("The Act also makes clear that local franchising authorities can regulate so-called 'Title II carriers' . . . only to the extent that Title II carriers provide cable services." (citing 47 U.S.C. § 522(7)(C)). Thus, Section 522(7)(C), as interpreted by the FCC's *First* and *Second Orders*, preempts those fees as to Comcast's broadband services revenue from 2016 to 2018.[5]

---

[5] Because the Court concludes that § 522(7)(C) preempts the ROW Fee as to Comcast's broadband services from 2016 to 2018, the Court need not address Comcast's argument related to § 541(b)(3).

**D. Comcast Business LLC**

The City also argues that even if the Cable Act preempts the ROW Fee as applied to Comcast, it does not preempt the ROW Fee as applied to Comcast Business because Comcast Business is not a "cable operator" within the meaning of the Cable Act. ECF 62, at 35-36. The Cable Act defines "cable operator" as any person "(A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system." 47 U.S.C. § 522(5). The Court notes that the FCC rejected a similar argument in the *Third Order*. *See Third Order*, ¶ 80 n.322 ("Such preemption applies to the imposition of duplicative taxes, fees, assessments, or other requirements on *affiliates of the cable operator* that utilize the cable system to provide non-cable services." (emphasis added)); *id.* ¶ 80 n.323 ("[A] cable operator may provide voice or broadband services through affiliates, and an LFA could not impose duplicative fees on those affiliates."). These statements, however, appear in the FCC's discussion of the definition of "franchise fee" under § 522, which the Sixth Circuit rejected as a basis to apply the mixed-use rule to incumbent operators that are not common carriers. *See City of Eugene*, 998 F.3d at 712-14. Thus, to the extent these statements rely on invalid portions of the *Third Order*, the Court will conduct an independent analysis of this issue.

The Court finds that the mixed-use rule applies equally to a cable operator's affiliates and to the cable operator itself. The City argues that § 544(b)(1) does not apply to a cable operator's affiliates because the Cable Act defines "affiliate" separately from "cable operator" and refers to "affiliates" in other sections. *See* 47 U.S.C. § 522(2). Section 544(b)(1), however, does not distinguish between "affiliate" and "cable operator." Further, even if § 544(b)(1) did distinguish between those two terms, the ROW Fee applied to Comcast Business would impermissibly

circumvent what the Cable Act prohibits. As described above, § 544(b)(1), as interpreted by the FCC and upheld by the Sixth Circuit, prohibits local franchising authorities from collecting fees from a cable operator's provision of non-cable services over a cable system. *See Third Order*, ¶¶ 74, 76, 106; *City of Eugene*, 998 F.3d at 714-16. A fee that would be otherwise prohibited by § 544(b)(1) but solely imposed on that cable operator's affiliate would therefore amount to an "end-run" around precisely what the Cable Act prohibits. *See City of Eugene*, 998 F.3d at 711, 715. Thus, the ROW Fee levied against Comcast Business for Comcast's provision of non-cable services also is preempted.

**E.  Comcast's Claim under the Contract Clause**

The City also moves for summary judgment against Comcast's Contract Clause claim. The United States Constitution provides, in relevant part, that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const., art. I, sec. X, cl. 1 (Contract Clause). Courts apply a two-step test to determine whether a challenged state law violates the Contract Clause. *See Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). The first question is whether the law at issue amounts to a "substantial impairment" of a contractual relationship. *Id.* at 1821-22. To determine whether a state law amounts to a substantial impairment, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.* at 1822. Next, if the law is a substantial impairment to the contractual relationship, the second question is whether the law was "drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Id.* (cleaned up) (quoting *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-12 (1983)).

The City argues that the ROW Fee does not substantially impair its contractual bargain with Comcast because the Franchise Agreement expressly reserves the City's right to impose

additional fees for non-cable services. *See* ECF 56, Ex. 1, § 2.1(C) ("This Agreement shall not be interpreted to prevent the Granter from imposing lawful additional conditions including additional compensation conditions for use of the Public Rights of Way should Grantee provide service other than Cable Service. Nothing herein shall be interpreted to prevent Grantee from challenging the lawfulness or enforceability of any provisions of applicable law."); *id.* § 2.8 ("The Franchise issued, and the Franchise fee paid hereunder, are not in lieu of any other required permit, authorization, fee, charge, or tax, unless expressly stated herein."); *id.* § 3.1(A) ("The Franchise fees are in addition to all other fees, assessments, taxes, or payments of general applicability that the Grantee may be required to pay under any federal, state, or local law to the extent not inconsistent with applicable law.").

In response, Comcast argues that the ROW Fee substantially impairs the Franchise Agreement because the Agreement states that it is subject to federal law. Thus, Comcast argues, the ROW Fee violates the parties' contractual bargain because federal law precludes that fee. ECF 60, at 22 n.4, 26 n.6. The Court is not persuaded. Section 2.8 of the Agreement provides: "The Agreement and all rights and privileges granted under it are subject to, and the Grantee must exercise all rights in accordance with, applicable law as amended over the Franchise term." ECF 56, Ex. 1. This section, or any other section of the Agreement, however, does not by its terms prohibit the City from imposing additional fees such as the ROW Fee. The ROW Fee therefore does not substantially impair the parties' contractual relationship. Comcast provides no authority for the proposition that the Court should assess whether the ROW Fee substantially impairs only the terms of the Franchise Agreement permitted under federal law, even if that Agreement states that it is subject to federal law. The Court therefore grants the City's motion for summary judgment against Comcast's Contract Clause claim.

The City also seeks attorney's fees in defending against Comcast's Contract Clause claim, arguing that the claim lacked any foundation. In a civil rights lawsuit under 42 U.S.C. § 1983, a district court may in its discretion award the prevailing party its reasonable attorney's fees as part of costs. 42 U.S.C. § 1988(b); *A.D. v. Cal. Hwy. Patrol*, 712 F.3d 446, 460 (9th Cir. 2013). If the defendant is the prevailing party, the district court may award fees under § 1988(b) "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation." *Fox v. Vice*, 563 U.S. 826, 833 (2011) (quoting *Christiansburg Garment Co. v. Equal Emp. Opportunity Comm'n*, 434 U.S. 412, 421 (1978)). Although Comcast's Contract Clause claim lacks merit, the claim was not frivolous, unreasonable, or without foundation. Thus, the Court declines to award attorney's fees.

**F. Comcast's Common Law Claims for Equitable Monetary Relief**

The City challenges Comcast's state law claims for "money had and received" and "unjust enrichment" on the basis that § 555a prohibits Comcast from collecting money damages. Section 555a(a) provides:

> In any court proceeding pending . . . involving any claim against a franchising authority . . .  arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise, any relief, to the extent such relief is required by any other provision of Federal, State, or local law, shall be limited to injunctive relief and declaratory relief.

47 U.S.C § 555a.[6]

_____

[6] The City argues that § 555a bars all claims arising from *or related to* the regulation of cable service or the grant, renewal, transfer, or amendment of a franchise. Section 555a, however, only bars claims *arising from* the regulation of cable service or the grant, renewal, transfer, or amendment of a franchise. The text of the statute does not reach as far as the City contends.

The Ninth Circuit considered the contours of § 555a in *Comcast of Sacramento I, LLC v. Sacramento Metropolitan Cable Television Commission*, 923 F.3d 1163 (9th Cir. 2019). In *Comcast of Sacramento*, Comcast and the franchising authority disputed whether the franchising authority's annual fee assessment against cable franchises counted toward the Cable Act's five percent fee cap. *Id.* 1166-67. The parties also disputed whether Comcast could deduct other fees from its gross revenues before calculating the five percent fee cap under the Act. *Id.* at 1167. As part of that dispute, the franchising authority transferred Comcast's security deposit paid pursuant to the cable franchise agreement to the City's general fund. *Id.* Comcast then brought claims for "conversion" and "common count" under California law, seeking compensatory damages in the amount of its security deposit. *Id.*

The Ninth Circuit held that § 555a barred Comcast's claims for money damages. *Id.* at 1172. The Ninth Circuit explained that even though Comcast's complaint did "not mention or obviously concern cable regulation," the complaint could not be viewed in isolation, and that on the whole, the relief sought was "inextricably intertwined with a wider, ongoing disagreement between the parties that plainly arises from the interpretation of federal and state laws that govern the calculation of cable franchise fees under the current CPUC-issued franchise agreement." *Id.* at 1170. Because Comcast's claims had "more than a tangential connection with cable regulations," Comcast could not seek compensatory damages.[7] *Id.*

---

[7] The Ninth Circuit in *Comcast of Sacramento* expressly reserved the question of whether § 555a allows equitable relief. *Id.* at 1172 ("We have not considered whether a claim for equitable relief would also be subject to § 555a(a)'s bar."). Here, Comcast's third and fourth claims for monetary relief are brought as "equitable" claims. In *AMG Capital Management, LLC v. FTC*, 141 S. Ct. 1341 (2021), the Supreme Court held that although the FTC Act authorized the Federal Trade Commission (FTC) to obtain injunctive relief, including permanent injunctive relief, that authorization did not permit the FTC to seek or a court to award equitable monetary relief such as restitution or disgorgement. Thus, the Court concludes that § 555a also prohibits equitable monetary relief.

PAGE 36 – OPINION AND ORDER

Unlike the relief sought in *Comcast of Sacramento*, Comcast's claims for monetary relief here do not arise from the City's regulation of cable service. In *Comcast of Sacramento*, Comcast's claims arose from a dispute about how to calculate Comcast's cable franchise fees under the Act (including whether the California Public Utilities Commission annual fee was a "franchise fee" under the Act) and the terms of Comcast's cable franchising agreement. *Id.* at 1170; *see also id.* at 1165 ("This lawsuit concerns the calculation and payment of cable franchise fees."). Here, by contrast, Comcast's claims for monetary relief arise from a dispute about whether the City can collect fees for Comcast's provision of broadband services, not cable services, over the City's rights-of-way. The parties do not dispute how to calculate Comcast's five-percent cable franchise fee, whether Comcast has paid that fee, or the terms of Comcast's cable franchise agreement. *See* ECF 56, ¶ 5. Further, Comcast does not challenge the City's authority to regulate cable services.

Nor do Comcast's claims arise from "a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise." *See* 47 U.S.C. § 555a(a). The City points to Comcast's preemption arguments under § 544(b)(1), which prohibit franchising authorities from imposing requirements for information services in franchise proposals, and the fact that Comcast's Consolidated Third Amended Complaint refers to the words "franchise" or "franchising" 57 times. ECF 68, at 10. None of these arguments answers the question posed here, which is whether Comcast's claims for money damages arise from a *decision of approval or disapproval* of a franchise. The ROW Fee is preempted as to Comcast's broadband services because it amounts to an attempt to circumvent the prohibition in § 544(b)(1) of those fees in a franchise proposal, but Comcast's claims do not arise out of any *decision* by the City to approve

or disapprove "the grant, renewal, transfer, or amendment" of a franchise. *See id.* Section 555a,

therefore, does not bar Comcast's claims for money damages.

Further, the equitable monetary relief that Comcast seeks here is not the sort of money

damages Congress intended to limit when it enacted § 555a. Comcast only seeks restitution for

the ROW Fee it paid under protest after informing the City that it believed the ROW Fee as

applied to broadband services violated federal law. Comcast agreed to pay the ROW Fee under

protest to avoid litigation. Now that the parties have resorted to litigation, Comcast seeks return

of those fees it paid under protest. The legislative history reveals that Congress enacted § 555a

not with equitable monetary relief in mind but rather to curb the threat of large damage claims

based on an authority's franchising decisions lawfully made pursuant to the Cable Act. Congress

explains:

> The purpose of [§ 555a] is to limit the franchising authorities'
> liability for monetary damages for acts taken pursuant to the 1934
> Act as amended by the 1984 Act.
> . . . .
> . . . Congress never contemplated that local authorities would be
> subject to liability for monetary damages for carrying out the
> franchising process that the 1984 Act explicit[l]y permitted to be
> performed. Nevertheless, in the past 6 years, several cities and
> municipalities have exercised their authority to issue less than all
> of the cable franchises requested of them, and they have been sued
> by parties to whom cable franchises were not issued, or who have
> not been issued franchises on the terms and conditions they
> wished.
> The plaintiffs in these cases claim that the failure of the local
> franchising authority to grant them franchises, or the failure to
> issue franchises on the terms and conditions they desire, even if
> fully consistent with the 1984 Act's amendments to the 1934 Act,
> violates their First and Fourteenth Amendments rights of free
> speech, free press, due process and equal protection. Based on an
> alleged violation of those rights, plaintiffs in these actions seek
> damages from franchising authorities, typically under the Civil
> Rights Act of 1871 (42 U.S.C. 1983), and parallel State civil rights
> laws, as well as injunctive relief.
> In the aggregate, the damage claims against franchising

> authorities have total[]ed in the hundreds of millions of dollars.
> Whether the parties are entitled to these damages under existing
> law is far from clear. However, the mere pendency of these large
> damage claims has had significant adverse effects on the
> functioning of local governments.

S. REP. NO. 102-92, at 48-49. The legislative history makes clear that Congress did not intend to

penalize a cable operator for making a good faith attempt to avoid litigation over a fee that

exceeded a municipality's authority under the Act. The Court here only restores Comcast to the

position it would have been in if it had refused to pay the contested ROW Fee beginning in 2016.

Thus, the legislative history of § 555a confirms that the restitution Comcast seeks here is not the

type of monetary relief that Congress intended to prohibit.[8]

## G. Remaining Claims and Defenses

Finally, the Court briefly addresses two remaining claims and defenses asserted by the

parties. First, the City argues that Comcast's claims are barred by the Tax Injunction Act (TIA),

28 U.S.C. § 1341.[9] ECF 68, at 37. The City, however, raised this argument for the first time in its

reply brief. The Court finds that the City has waived this argument and declines to consider it.

*See Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) ("arguments raised for the first time

in a reply brief are waived"); *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district

court need not consider arguments raised for the first time in a reply brief.").

---

[8] The Court recognizes that in *Comcast of Sacramento*, the Ninth Circuit rejected a reading of § 555a as prohibiting only monetary relief for First Amendment claims. *Comcast of Sacramento*, 923 F.3d at 1171 n.4. The Court here does not suggest that § 555a is so limited but only includes the relevant legislative history to show that in addition to the fact that the text of § 555a does not apply, its legislative history also shows that the restitution Comcast seeks was not the type of relief Congress intended to prohibit.

[9] The TIA provides: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341.

Second, as an affirmative defense against the City's first and second counterclaims, Comcast argues that the Internet Tax Freedom Act (ITFA), 47 U.S.C. § 151 note, preempts the ROW Fee.[10] The City has moved for summary judgment against this affirmative defense. Because the Court concludes that the City's first and second counterclaims fail because the Act preempts the ROW Fee, the Court need not resolve whether the ROW Fee is a "tax" under the ITFA and, if so, whether it is preempted by that statute.

## CONCLUSION

The Court GRANTS Comcast's Supplemental Motion for Partial Summary Judgment (ECF 55). The Court GRANTS summary judgment in favor of Comcast on its second claim for relief (Declaratory Judgment) and against the City's first and second counterclaims. The Court GRANTS IN PART AND DENIES IN PART the City's Motion for Summary Judgment (ECF 58). The Court GRANTS summary judgment in favor of the City on Comcast's first claim for relief (§ 1983, Contract Clause), DENIES summary judgment for the City against Comcast's remaining claims, and DENIES summary judgment for the City on its first and second counterclaims.

**IT IS SO ORDERED**.

DATED this 29th day of June, 2022.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

---

[10] In relevant part, the ITFA states: "No State or political subdivision thereof may impose . . . Taxes on Internet access." ITFA § 1101(a), 47 U.S.C. § 151 note.